264 So.2d 304 (1972)
William H. WRIGHT, Jr.
v.
MARK C. SMITH & SONS PARTNERSHIP et al.
No. 8715.
Court of Appeal of Louisiana, First Circuit.
February 16, 1972.
On Rehearing June 23, 1972.
Rehearing Denied July 28, 1972.
Writs Granted September 18, 1972.
*306 Donald A. Meyer, New Orleans, for American Employers Inc. Co.
G. T. Owen, Jr., Baton Rouge, for Wright.
Joseph H. Kavanaugh, Baton Rouge, for Smith.
Before LANDRY, BLANCHE and TUCKER, JJ.
TUCKER, Judge.
Initially plaintiff, William H. Wright, brought this suit against the defendants to recover from the named Smith defendants and their insurer, American Employers Insurance Company, the sum of one million eighty three thousand, eight hundred ninety-two and 95/100 ($1,083,892.95) dollars. The plaintiff in his main demand sought recovery of the aforesaid sum in his representative capacity as an officer of Beaurivage of Mandeville, Inc., a Louisiana corporation. In the alternative, and if, for any reason Beaurivage was not allowed to recover, Wright demanded that recovery be awarded to him in his individual capacity in the stated amount. The petition reflects that any liability on the derivative or alternative demands found against American Employers should be limited to the principal amounts of two builder's contractor bonds, executed by this insurance company, guaranteeing the performance of Mark C. Smith & Sons on two building contracts between Smith & Sons, as contractor, and Beaurivage, as owner, together with penalties, 10% attorney fees, interest, and costs.
The record shows that in the early part of 1968 Bilwood Smith, who died on August 10, 1968, managed to interest the plaintiff and Senator Russell B. Long in a business venture involving the purchase of approximately 400 acres of land in St. Tammany Parish Louisiana, with the ultimate objective of creating a subdivision. The purported price of the land was the sum of $1,100,000.00. A commitment for the permanent financing of the project, subject to certain conditions and requirements, was obtained from Guaranty Bond and Finance Company, Inc. by the parties on March 26, 1968.
In the meantime it was necessary to arrange for the interim financing of the transaction. City National Bank, Baton Rouge, La., in consort with Chase Manhattan Bank of New York, furnished the interim financing with CNB advancing $600,000.00 and Chase apparently advancing the remainder of $1,500,000.00. Just prior thereto on April 8, 1968 Beaurivage of Mandeville, Inc. was incorporated, listing Bilwood Smith as its president and director, Mark C. Smith III as its vicepresident and director, and William H. Wright, Jr. as its secretary-treasurer and director. The capital stock of this corporation was issued in the proportions of 25% to Wright, 25% to Senator Long and 50% to the Smiths. On May 6, 1968 Mark C. Smith & Sons executed two building contracts with Beaurivage as owner, one of the said contracts being for the construction of site improvements on the proposed subdivision including road, sewer, drainage and water for the price of $360,000.00, and the other contract being for the renovation of the Weiss and Penick residences (the golf club house and the racquet and swim club) for the price of $175,000.00. Performance and lien bonds in the principal amount of each contract were furnished by the defendant, American Employers. The buildings contracts were to be completed within one year or on June 1, 1969.
The interim financing indebtedness was represented by a note of Beaurivage to CNB, secured by a mortgage on the subject property and the individual endorsements of Wright, Senator Long and each of the Smiths.
After Bilwood Smith died on August 10, 1968, Mark C. Smith, III was elected president: of Beaurivage, and it was not until January, 1969 that Mark C. Smith III developed cost estimates indicating that the *307 cost of the site improvements would greatly exceed the contract price of $360,000.00. Some 23 concerns were solicited to submit bids on the job, and the lowest bid received was submitted by Boh Brothers Contract Co., Inc. in the sum of $1,343,842.95. The defendant contends that the call for bids was made by Mark C. Smith III in his then capacity as president of Beaurivage, while the plaintiff in brief says the record is not clear whether Smith was acting for the Smith partnership and its members or for Beaurivage. Defendants strongly urge the plans and specifications used in calling for bids bore no resemblance to the original contract, and that in reality the original contract did not include any plans or specifications which described and delineated the scope, character and type of the work imposed upon the contractor. In effect the defendants claim that this building contract was at its inception so indefinite as not to be subject to a reasonable interpretation. The defendants reason that the so called contract for site improvements was a nudum pactum and, therefore, legally unenforceable. The defendants further say that the new plans and specifications developed long after the contractual instrument of May 6, 1968, and on which the call for bids was made would have the effect of attempting the confection of a new contract without the consent of both contracting parties. The plaintiff says that the parties, especially the contractor, had full knowledge of the work required, and the obligations imposed upon him and his other partners by the provisions of the contract; that this knowledge was also shared by American Employers. In support of this position the plaintiff points to an ordinance adopted by the St. Tammany Parish Police Jury setting forth the minimum requirements for site improvements in order to qualify a tract of land as a legal and acceptable subdivision.
As can be surmised the work was not done by the Smiths, and by letter, dated May 29, 1969, CNB, after determining that Beaurivage and the Smiths would not discharge the quarterly interest payments due on June 15, 1969, called on Beaurivage to cause the said contracts to be performed according to their terms and conditions. Copies of this letter were addressed to Mark C. Smith & Son and to American Employers. In turn on May 30, 1969 Beaurivage wrote the Smiths and American Employers, noting that that the contract funds were available; that no work had been performed; and that the completion of the work under the contracts was necessary in order to comply with the CNB requirements under the mortgage and the requirements of the permanent financing commitment of Guaranty Bond & Finance Co., Inc. By a letter postmarked June 25, 1969, as previously stated, Mark C. Smith & Sons wrote to Beaurivage, denying any obligations under the building contracts for the reason that the Smiths had never been furnished with plans and specifications from which the scope of the work "can be determined". The Smiths denied the validity of the contracts, and incidentally stated that in view of the invalidity of the building contracts that the surety contracts, being accessory engagements, where ineffectual, and they were seeking a return of the policy premiums from American Employers. Beaurivage responded by letter of July 1, 1969 to the Smiths with a copy to American Employers that it intended to enforce its rights under the contracts and bonds.
The trial court dismissed the exceptions and proceeded with a trial on the merits. The lower court dismissed the demand of Beaurivage, stating in its reasons for judgment that "The contracting parties involved, i. e., the stated owner and the contractor, were really to all practical intents and purposes one and the same" and "We think it would be unconscionable to allow this corporate entity to recover under the facts and circumstances so clear in this particular record." For the purpose of our decision we are not required to determine if Beaurivage was a mere alter ego of the Smiths, Mr. Wright and Senator Long.
*308 We do note, however, that the partners of Mark C. Smith & Sons, who were the contractors under the subject agreements, also held 50% of the stock in Beaurivage, the owner corporation. The record clearly shows that the owner corporation had full knowledge that the contracting parties at the very outset did not intend that the Smith partnership would perform the site improvements contract, but, rather, that this agreement would be subbed to another contractor able and equipped to handle the job. The parties were fully aware that the Smiths did not have the capacity or means to undertake this type of work. The trial court also held that, since it was entertaining the derivative action of Beaurivage, the alternative claim of Wright individually was ineffective. On March 22, 1971 the trial court signed a judgment in favor of CNB on its intervention for a net sum of $406,808.60 with interest and costs against the defendants Mark C. Smith & Sons, Mark C. Smith, Mark C. Smith III, and the Succession of Bilwood Smith, and American Employers Insurance Company. The demands of plaintiffs, Beaurivage and William H. Wright, Jr. were rejected. From this judgment the defendants bring this appeal and the plaintiffs also appeal the rejection of their demands against the defendants.
There are numerous issues raised by the litigants, but those requiring consideration in order to resolve this litigation are rather limited in number.
Initially it must be determined if the allegations of the petition and intervention support plaintiffs' and intervener's contention that American Employers practiced deceit and fraud, or in the absence of such allegations, whether the record reflects testimony depicting fraud which would enlarge the pleadings and open the gates to claims greatly in excess of principals of the bonds. The petition and intervention contain no allegations of fraud and deceit. The plaintiffs and intervenor, however, earnestly contend that the fraud issue has been raised and the pleadings broadened by the testimony of Carl C. Coward, employee of American Employers, who stated that it was not the intention of the parties that the bonds would be valid and enforceable in view of the fact that the contracts, especially the site improvements one, would be subbed by the Smith interests to a subcontractor competent to perform the work. Counsel for plaintiffs and intervenor concludes that Cowand's testimony indicates American Employers repudiated and welshed on its surety agreements from the time such were executed, and that in some fashion this suit was no longer limited to the principal amounts set forth in the building contract bonds, and that the fraudulent and tortious conduct of the insurance company in "welshing" on its agreements had somehow rendered it liable far in excess of the contractual amounts.
We do not agree with this position. Counsel fails to note that the witness Cowand clearly stated that he considered his company was responsible under its bonds, and that such responsibility would cease only when other bonds were substituted for those already executed, resulting from a subcontract of the work. Cowand also stated in essence that a sub-contract and a bond guaranteeing the same would not, unless the affected parties agreed, result in the release and cancellation of the original bonds. As a matter of fact William H. Wright, Jr. was fully aware that the site building contract would be subbed, and he hoped to write the bond guaranteeing the subcontract. Wright was not only the secretary-treasurer of Beaurivage, but, as well, a director of CNB. It is of no moment whether the parties envisioned that the subject bonds would be replaced by new bonds of a subcontractor, or if the original bonds would continue in full force and effect along with the new bonds of the subcontractor. Suffice it to say, that the validity and enforceability of the American Employers' bonds is not affected by any side agreement not joined in by all of the concerned parties. We, therefore, conclude, as did the trial judge, that the record is devoid of evidence which would *309 in any sense justify the injection of fraud and deceit on the part of American Employers into these proceedings.
The next question extensively treated by counsel is American Employers' position that the two building contracts were invalid and unenforceable for reason that there were no plans or specifications definitively describing the work to be performed under the contracts when such were executed on May 6, 1968; that all of the parties were fully aware that the site contract expressly stated that these improvements would be consummated in accordance with the drawings, plans and specifications prepared by Edward E. Evans & Associates, Consulting Engineers and that neither the Evans' documents nor any other plans and specifications were attached to the site contract. Counsel for defendant concedes that the renovations contract covering the refurbishing of the Golf Clubhouse, Racquet and Swim Club and Pro Shop was accompanied by tentative drawings and plans prepared by Dodds, Hotard & Vicari, architects, but defendants claim that these documents were preliminary and not in sufficient detail to warrant a firm bid on the renovations contract. American Employers urgently maintain that the building contracts were not subject to reasonable interpretation due to a total absence of plans and specifications to denote the work imported by the site contract on the one hand, and the lack of finality of the plans and specifications with respect to the work required by the renovations contract on the other hand. The plaintiffs and intervenor steadfastly contend that the owner, builder and bonding company had full knowledge of the work required by the contracts and in support thereof they point to the testimony of Mr. Dobson, the St. Tammary Parish engineer, which was to the effect that the site work could have commenced with the use of the subdivision plot plan and the minimum standards, encompassed in Ordinance No. 181 of St. Tammany Parish setting forth the minimum construction requirements that must be met before obtaining approval of a subdivision by the Police Jury. That portion of the Dobson testimony suggesting that somewhere along the route plans and specifications should be forthcoming is not emphasized. Further the testimony of Mr. Womack, a contractor, is offered to prove that the detailed plans and specifications are not essential at the time of the adoption of a building contract. We think the witnesses Dobson and Womack were mainly concerned with the mechanics of starting the improvements attendant to a subdivision operation. We note that Dodds estimated the renovations job, according to his preliminary plans and specifications, could be accomplished for $168,250.00, yet Mr. Womack estimated a proper bid on this contract would amount to a sum in the neighborhood of $400,000.00. Mr. Labbe, a civil engineer, who had worked for Boh Brothers Construction Co. Inc., testified that a contractor would be unable to submit a firm bid on a building contract unless he was furnished with detailed plans and specifications of the work to be performed. As set forth in the brief of plaintiffs and intervenor Mr. Labbe stated he had done no subdivision work for his employer, but he had made estimates on such projects for two to three years previously.
The evidence shows that the plaintiff, William H. Wright, Jr., late in 1968 or early 1969, became alarmed due to the fact that the work on the contracts had not in any wise progressed. Mr. Evans in February of 1969 was requested to prepare plans and specifications for the site building contract. These documents were not completed and finally submitted until May 16, 1969 some fifteen days before the original contract was to expire on June 1, 1969. The record shows that three days in advance of this submission, on May 13, 1969, the St. Tammany Parish Police Jury granted preliminary approval of the subdivision known as Beau Chenes, developed by Beaurivage. After Evans & Associates had prepared its set of plans and specifications, redesigning the subdivision work long after the execution of the site building contract, the low bid to perform the work submitted by Boh *310 Brothers was in the sum of $1,343,842.95, almost four times the sum allocated for this job in the contract.
Though our decision is not geared to the validity of these two original building contracts, we believe that the site building contract was not, at its inception, an enforceable and valid agreement because, in the absence of any plans and specifications being attached thereto and to which specific reference was made therein, none could determine the work imported and required by the contract. This principle is recognized in the cases of Jones v. Janes, 156 La. 715, 101 So. 116 (1924) and Greater Houston Suburban Corp. v. Dupuy & Mullen, 176 S.W. 668 (Tex.Civ.App.1915) and in Williston on Contracts (3rd ed.) Vol. 1, Sec. 42, pg. 136. While the renovations contract contained plans and drawings prepared by Architect Dodds and this witness estimated that the work envisioned by these plans and specifications could be done for $168,250.00, less than the price stated in the contract, these plans and specifications were revised and changed to such an extent that the cost of the work to be done under the new plans is no standard for measuring the damages recoverable against the surety under the old contract.
In our opinion the proposition is unassailable that the prime site contract was void and unenforceable at the outset and the surety contract, constituting an accessory adjunct, likewise, falls, is invalid and unenforceable. For the purposes of this decision we do not pass upon the validity and enforceability of the renovations contract and its accessory surety bond.
We agree with the general legal proposition that the knowledge of an officer in the conduct of its business is imputable to the corporation, and that such principle is subject to limitations. The law is clear that where a corporate officer obtains knowledge when he is acting in a capacity other than his position as a corporate official and such information is against the welfare and interest of the corporation, that such knowledge is not imputable to the corporation. However, the facts and circumstances of this case do not warrant the conclusion that information was possessed by Bilwood Smith which was inimical to the interest of Beaurivage. The purported side agreement between Smith and American Employers, as stated above, that the bonds would have no binding effect, had no bearing on and did not adversely affect the efficacy, enforceability and validity of the bonds. The building contracts contained language expressly suggestive of permission to sub the contracts. The line of cases cited in plaintiffs' brief, in support of the position that the facts here warrant holding that this case is an exception to the general rule, are inapposite. On this score the general rule applies, and we hold that Beaurivage had full knowledge of the transactions at hand. We concur in the trial court's denial of recovery to Beaurivage.
With reference to the secondary claim of plaintiff William H. Wright, Jr. for damages due to the failure of performance on the building contracts, we concur in the trial court's finding that Wright is not entitled to recover on the ground he was not led astray by fraud or deceit on the part of any defendant, especially American Employers. We likewise find that in regard to American Employers, Wright was not a named beneficiary in either performance bond. Wright, therefore, has failed to establish any basis either contractual or otherwise upon which he may recover from any defendants. In addition, Mr. Wright does not set forth or prove any yardstick for measuring such damages which he may have sustained as a result of the failure of performance under the contracts. We concur in the trial court's rejection of recovery to Wright individually.
We find that the trial court erred in not rejecting CNB's intervention after dismissing plaintiff's main demands on the merits.
*311 LSA-C.C.P. art. 1031 provides for categories of incidental demands, namely, reconvention, intervention and the demand against third parties.
LSA-C.C.P. art. 1091 states that a third person having an interest in a pending action may intervene therein to enforce a right related to or connected with the object of the pending action against one or more of the parties thereto. It further recites that intervenor may join plaintiff in demanding the same or similar relief against defendant, or join defendant in resisting plaintiff's claim, or oppose both plaintiff and defendant.
In this instance, the CNB's claim is clearly an intervention. The pleading is styled an intervention. It recites its claim to deficiency judgment against original plaintiff Beaurivage, and asserts a preferred claim against any recovery by Beaurivage in the suit and the application thereof to the deficiency judgment owed it by its alleged debtor. Having joined plaintiff in the main demand, and asserting an entitlement to preferred payment of any sum recovered by plaintiff Beaurivage against defendant, CNB's legal position is unquestionably that of intervenor.
Our jurisprudence under former Code of Practice Article 389 establishes that intervention follows the main demand, consequently dismissal of plaintiff's suit ipso facto carries with it dismissal of the intervention. In Gorman v. Gorman, 158 La. 274, 103 So. 766, the Supreme Court squarely held an intervention may not retard trial of the main demand and can only be tried on the merits at the same time as the main demand.
In Emmco Insurance Company v. Globe Indemnity Co., La.App., 105 So.2d 748, plaintiff and its insured, Strong, sued Globe for damages to Strong's automobile incurred in an intersectional accident with Globe's insured Pitti. An intervention was filed by Pitti seeking damages from Strong for personal injuries sustained by Pitti in the accident. Strong's exception to the intervention was overruled by the trial court. The trial court rendered judgment in favor of Strong and Emmco against Globe and rejected Pitti's intervention on the merits. Pitti appealed.
On appeal, the court held in effect that Pitti's intervention was improvidently allowed because Pitti did not join either plaintiff or defendant, and neither did he oppose both. In effect, the court held that Pitti was without interest in the action and should have been relegated to an independent action. Nevertheless, the court, relying on Barron v. Jacobs, 38 La.Ann. 370, and other authorities, reiterated the rule that dismissal of the main demand carries with it dismissal of an intervention.
In the more recent case of Chrysler Corporation v. City of New Orleans, 243 La. 498, 145 So.2d 11 (1962), the Supreme Court considered the intervention of the United States in a suit filed by Chrysler against the City of New Orleans to recover taxes paid under protest by plaintiff to the City. Intervenor prayed for judgment in favor of plaintiff. Defendant excepted to plaintiff's petition on the ground it stated no cause of action, which exception was sustained by the trial court but reversed on appeal. After remand, defendant filed an exception of lack of interest on the ground that plaintiff had been reimbursed by Intervenor the amount involved. The trial court overruled defendant's exception, gave judgment for plaintiff and defendant appealed.
The Supreme Court held the tax involved was imposed on owners which, in this instance was Intervenor, and that plaintiff had paid the taxes under instructions from Intervenor with attendant reimbursement, and the understanding that recovery by plaintiff, if any, would belong to Intervenor. The court held that plaintiff lacked interest to prosecute the suit, and on authority of Holley v. Butler Furniture Co., Inc., 217 La. 8, 45 So.2d 747 and Erskine v. Gardiner, 162 La. 83, 110 So. 97, *312 that an intervention stands or falls with the main demand. In a footnote to Chrysler, above, appearing on page 15, Volume 145 So.2d, the court noted that the suit, intervention and exception were filed prior to adoption of LSA-C.C.P. arts. 1031 and 1091, and also alluded to LSA-C.C.P. art. 1039 relative to the effect on an intervention resulting from the dismissal of an action pursuant to plaintiff's voluntary motion to dismiss.
LSA-C.C.P. art. 1039 provides:
"If an incidental demand has been pleaded prior to motion by plaintiff in the principal action to dismiss the principal action, a subsequent dismissal thereof shall not in any way affect the incidental action, which must be tried and decided independently of the principal action."
As indicated in the official revision comments to Article 1039, above, Article 491 of our Code of Practice of 1870 gave plaintiff the right to dismiss his action at any stage of the proceedings. An exception to this rule was established in those instances where defendant filed a reconventional demand prior to plaintiff's motion for voluntary dismissal. See cases cited in Official Revision Comments, Article 1039, above. As to intervention, however, the former rule appeared to be that in any event, an intervention falls with the main demand. See cases cited in Official Revision Comments, Article 1039, above.
It appears that Article 1039, above, was intended to provide a single exception to the well established rule that an intervention falls or stands with the main demand, and we so hold. We believe the obvious intent of Article 1039, above, is to eliminate the possibility of a plaintiff availing himself of the former ability to defeat an incidental demand against him by the simple expendient of voluntarily moving to dismiss his main demand after the incidental demand was filed against him. The article did not intend to change the rule that dismissal of a main demand on its merits carries with it dismissal of all incidental demands.
It is well settled that dismissal of an incidental demand pursuant to dismissal of the main demand on the merits must be without prejudice to the incidental demand inasmuch as the party bringing the incidental demand has the right to assert an independent cause of action. Gorman v. Gorman, above.
Under the circumstances, we find that the trial court erred in not dismissing the intervention of CNB upon rejection of Respondent's main demands on the merits. Such rejection, however, must perforce have been without prejudice which would entitle Intervenor to assert its claims by independent action.
Intervenor, however, has had its day in court. The improper ruling of the trial court enabled Intervenor to fully present its case which was most ably tried. To now dismiss Intervenor's claim without prejudice, for purely procedural reasons, and open the way for a retrial of the same issues upon facts which have already been completely developed, would indeed result in that multiplicity of litigation which the law abhors and seeks to prevent when justice can otherwise be done. For these reasons, we exercise the authority granted us by LSA-C.C.P. art. 2164 and consider CNB's intervention on the merits.
As stated above the City National Bank made demand on Beaurivage that the building contracts be performed on May 29, 1969, two days before expiration of the contracts. The Bank then instituted foreclosure proceedings under its mortgage, and purchased the property at sheriff's sale for the bid price of $1,100,000.00. Next the Bank obtained a deficiency judgment under date of December 7, 1970 in the Twenty-Second Judicial District Court, Parish of St. Tammany, for the sum of $1,448,788.54, together with 8% Interest from March 1, 1969 until paid, such interest subject to a credit of $21,466.33, and *313 less a credit of $1,093,895.75, the net sum of the bid price paid for the property at the foreclosure sale. The deficiency after all charges and credits left a balance on the indebtedness to CNB of $406,808.60. On December 15, 1969 CNB sold the subject property to Senator Long and Mr. Wright by credit sale for the stated price of $1,448,766.54, represented by a promissory note payable on demand.
The foregoing credit sale note discharged and replaced the original note indebtedness of $2,100,000.00. The bank records and ledger entry reflects that there is nothing due on the original note. The Chairman of the Board of CNB in his deposed testimony in the suit of Senator Long, which was removed to the federal court, conceded that the books of the Bank show nothing due on the original note, and that he did not know how the proceeds would be applied if CNB was successful in maintaining its judgment in these proceedings, and managed to effect collection from the defendant surety. The intervenor questions the relevance and admissibility of this testimony of Mr. Gottlieb. In any event the record is replete with other salient evidence which clearly shows that the Bank has experienced no loss in the premises.
As between CNB and American Employers there is no relationship of note holder and owner on the one hand and maker and/or endorser on the other. While it is true that a debtor may not claim credit against a deficiency judgment such overplus or profit which a creditor may realize from the sale of foreclosed property, American Employers was not a debtor of CNB under the $2,100,000.00 note. Under the circumstances it is not necessary for us to determine whether the trial court's judgment in favor of CNB was based on the deficiency between the total indebtedness due and the sum for which the foreclosed property was purchased.
We are unable to discern any acceptable means for fixing damages purportedly experienced by CNB resulting from failure of performance under the subject building contracts. Concedely, the Bank was an obligee under the bonds, but this fact does not establish a creditor-debtor relationship between CNB and American Employers under the note in question. This portion of the trial court judgment in favor of the intervenor, City National Bank, is erroneous and will be reversed.
For the foregoing reasons the judgment of the trial court will be reversed insofar as it granted judgment in favor of the intervenor, City National Bank, against the defendants. In all other respects the judgment is affirmed at the conjoint costs of the plaintiffs and intervenor.
Judgment affirmed in part; reversed in part; and rendered.

ON REHEARING
PER CURIAM.
On application by City National Bank, we granted a rehearing in this matter limited to the issue of whether the appeals taken by defendants, Mark C. Smith & Sons, Mark C. Smith, Mark C. Smith, III, and the Succession of Bilwood Smith, should be dismissed and the judgment rendered against said defendants in the trial court be affirmed for failure of said defendants to timely perfect their appeals.
In opposition thereto, the named appellants concede the appeal bonds required by law were not timely posted. Appellants urge, however, that since the contracts in question have been found unenforceable on appeal, and the surety thereon (American Employers Insurance Company) has been exonerated from liability on the performance bond issued in connection therewith, this court should invoke the rule announced in Department of Highways v. Clemmons, 252 La. 51, 209 So.2d 18, and hold that the appeal taken by the surety enures to the *314 benefit of the principals, Mark C. Smith & Sons, and the individual members of the partnership and its members also rely upon Brashear v. Carlin, 19 La. 395; Succession of Gilmore, 157 La. 130, 102 So. 94, and Finn v. Employers' Liability Assurance Corporation, La.App., 141 So.2d 852.
The cases are legion to the effect that to perfect an appeal, the appeal must be taken and the surety required posted within the time fixed by law, otherwise jurisdiction does not attach and the appellate court never acquires authority to entertain the appeal. See for example, Pan American Petroleum Corporation v. Cocreham, 251 La. 705, 206 So.2d 79; Geisenheimer Realty Co. v. Board of Commissioners of Port of New Orleans, La.App., 204 So.2d 628; LaRose v. LaRose, La.App., 211 So.2d 95; Michigan Wisconsin Pipe Line Co. v. Guarisco Enterprises, Inc., La. App., 234 So.2d 469. Such a lack of jurisdiction cannot be waived, Bergeron v. Oil Field Specialties, Inc., La.App., 212 So.2d 736; Blanks v. S. H. Kress Company, La. App., 204 So.2d 722.
We deem it elementary that failure to perfect an appeal, with the attendant result that jurisdiction never vests in the appellate court, is tantamount to not taking an appeal at all.
No principle of law is more firmly entrenched in our jurisprudence than that which declares that no relief can be granted a litigant who neither appeals nor answers his adversary's appeal. Talle v. De Monasterio, 48 La.Ann. 1232, 20 So. 687; Cox v. First National Bank in Arcadia, 195 La. 963, 197 So. 616; Betz v. Riviere, 211 La. 43, 29 So.2d 465; Succession of Babin, 213 La. 950, 35 So.2d 864; Dupuy v. Godchaux Sugars, Inc., La. App., 184 So. 735.
We find that the Gilmore and Finn cases, above, relied upon by the Smiths as furnishing the exception to the general rule that relief cannot be accorded a litigant who does not appeal, are clearly distinguishable from the case at hand. Succession of Gilmore involved suit to set aside a probated will on grounds which the court found amounted to fraud although fraud, as such, was not expressly plead. Finn involved wrongful death actions instituted against the tort feasor and his insurer in solido. Defendants excepted on the ground the insurer had previously been sued alone, in Federal Court, under the direct action statute, which suit was dismissed insofar as it exceeded the insurer's coverage limits. Plaintiffs then voluntarily dismissed their Federal Court action and instituted action in state court against both insurer and insured. Defendants' exceptions were based on the premise that plaintiffs exhausted their remedies by first filing suit in Federal Court, and as a result, waived their rights against the insured and were precluded from suing the insured in the state court. In effect, the court, in the Finn case, merely recognized the right of an injured party to sue both tort feasor and insurer either alone or in solido.
In Brashear, the court did indeed hold that reversal of a judgment against a principal enured to the benefit of and effected cancellation of a judgment against a surety on the same obligation although the surety had not appealed judgment against him.
In Clemmons, a contractor and its surety failed to apply for rehearing of an unfavorable judgment rendered against the Department of Highways, the contractor and its surety, for dirt taken from private property pursuant to contract with the Department of Highways. Upon writs taken to the Supreme Court by the Department of Highways, the Court held that although the contractor and surety had not applied for a rehearing before the Court of Appeal, nevertheless, review on certiorari obtained by the Department alone could include determination of the rights of contractor and surety. The rationale of the decision appears two-fold. First, it was determined that the circumstances of the case constituted an exception to the general rule that the judgment of a court of *315 appeal becomes final when no application for a rehearing is made by a litigant. The exception was based on equitable considerations and the necessity of protecting the public fisc, inasmuch as the judgment of the Court of Appeal increased considerably the award granted the property owners by the trial court. Secondly, it was determined that the Department, pursuant to its contract, was obligated to the contractor for any judgment executed against the contractor and its surety based on the use of the land involved, including the judgment in question.
The decision in Clemmons does not indicate that the contract obligated the Department to defendant actions brought against the contractor and surety relative to work performed under the contract. Nevertheless, the effect of the decision, in our judgment, imposes the obligation of defense on the Department without a finding that such obligation existed either under law or contract.
We respectfully submit that the decisions in Clemmons and Brashear are unsound for the reasons set forth in the two well reasoned dissents appearing in Clemmons. In addition, we are of the view that the rationale in these cases, namely, the equitable disposition of litigation; constitutes an anamolous and contradictory application of equitable principles. The result of the decisions is to reward one for his own laxity and laches. It also affords relief to one whose own inadvertence is the cause of the predicament from which extrication is sought. Moreover, equity may be invoked only where the law is silent. LSA-R.C.C. art. 21. In this area, not only is the law express, but also it has been consistently applied by a long line of jurisprudence. We make these observations in the hope that the Supreme Court will reconsider its ruling in Clemmons which, in our humble opinion, is contrary not only to clear constitutional and statutory provisions, but also to a long line of the Court's own jurisprudence.
Despite our disagreement with Clemmons, we recognize its binding effect. We decline, however, to apply its rule in the case at hand because we find the instant matter distinguishable on a salient fact. In Clemmons, jurisdiction of the contractor's and surety's appeals vested in the appellate court because these appeals were timely taken and perfected. The court, in Clemmons, at least had jurisdiction to hear the appeals in controversy. In the case at hand, however, jurisdiction of the appeals in question never vested in this court because the appeal bonds were not timely filed. Under long established jurisprudence, neither this court nor any other court of this state has ever acquired jurisdiction pursuant to which relief could be granted the partnership and its members.
We affirm that portion of our original decree which dismissed and rejected the claim of plaintiff, William H. Wright, Jr., as an officer of Beaurivage of Mandeville, Inc., and also his alternative personal demand. We likewise affirm that portion of our original decree which reversed the judgment of the trial court in favor of Intervenor, City National Bank, against defendant in reconvention, American Employers Insurance Company.
We reverse that portion of our original decree which overruled and set aside the judgment rendered by the District Court in favor of Intervenor, City National Bank, against defendants in reconvention, Mark C. Smith & Sons, Mark C. Smith, Mark C. Smith, III, and the Succession of Bilwood C. Smith, and affirm the judgment rendered by the trial court in favor of Intervenor against said defendants in intervention, Mark C. Smith & Sons, Mark C. Smith, Mark C. Smith, III, and the Succession of Bilwood C. Smith. All costs of these proceedings shall be paid jointly by plaintiff, William H. Wright, Jr., and defendants, Mark C. Smith & Sons, Mark C. Smith, Mark C. Smith, III, and the Succession of Bilwood C. Smith.
Reversed in part and affirmed in part.